UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-CR-166-PPS |
| | ) | |
| LAJUAN FITZPATRICK, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

In November 2019, a jury found Lajuan Fitzpatrick guilty of conspiracy to possess with intent to distribute marijuana (21 U.S.C. § 846—Count 1), and murder with a firearm during and in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)(A) and (j)—Count 2). Fitzpatrick seeks either a judgment of acquittal or, in the alternative, a new trial. Fed. R. Crim. P. 29(c) and 33 [DE 134, 135.] The evidence against Fitzpatrick was more than enough for a jury to have found him guilty beyond a reasonable doubt. Neither an acquittal nor a new trial is warranted here.

### **Background**

On December 2, 2013, three gang members attempted to rob a drug dealer, and a man in a neighboring house was shot and killed in the process. Due to the number of witnesses and the different roles they play, I will attempt to clarify everyone's role as I introduce them in the story below, and for clarity's sake, and meaning no disrespect, will refer to some of them in this opinion by the role they played instead of by their name.

Gang members Bruce Hendry and Mark Cherry plotted to rob Anthony Martinez, a self-admitted drug dealer, of his stash of marijuana. [DE 128-131 Trial Transcript (Tr.) 296-97, 302, 345.] Cherry relayed this plot to his roommate Fitzpatrick who decided to join in, intending to split the proceeds with him. [Tr. 296, 308.] They left with two guns, a revolver and an assault rifle, and went to the home of Robert Nieto, another gang member, for further planning and to meet Hendry. [Tr. 296-300, 317, 579.] Nieto said the robbery would be a breeze and they could easily walk away with a couple pounds of marijuana, but he planned to stay at home to monitor the police scanner and alert them if needed. [Tr. 302-04, 309.] (Nieto was convicted in a separate trial for his involvement in this episode and other racketeering related offenses all stemming from his involvement with the Latin Kings.)

A fourth man, James Landrum, serving the role of get-away-driver, picked up the trio and drove them to Martinez's home. [Tr. 577-80.] Cherry and Fitzpatrick wore black hoodies and masks and sat in the back seat. [Tr. 122-24, 318.] Upon arrival, Hendry and Cherry approached the front door while Fitzpatrick stayed outside by the street. [Tr. 122.] Fitzpatrick was armed with a rifle and was providing "cover" from outside the home to the others. Hendry and Cherry knocked on the front door but no one answered, so they went around to the back door. [Tr. 123, 321.] When the homeowner, Martinez, answered the door, Hendry pistol-whipped him and pushed him back into the residence while Cherry demanded the marijuana. [Tr. 124-26.] There were three others in the house that night, two of Martinez's friends and his fiancée,

Mary Hensley. They all fled. [Tr. 126-28.] Shots were fired and a fight ensued. [*Id.*] Martinez's brother, Elias Martinez, lived next door, and rushed over to assist after hearing the commotion. [*Id.*] The brother grabbed Hendry, and Martinez tackled Cherry. [Tr. 131, 184-85, 202-03.] Cherry shot at and missed Martinez, who was able to wrestle the gun away from Cherry. Martinez then shot Cherry twice in the abdomen. [Tr. 138, 321.]

While this was going on, Fitzpatrick stood outside and fired the assault rifle towards the house. [Tr. 141, 248, 582.] Recall that two of Martinez's friends had fled outside. One of those friends, a guy named Horst, identified Fitzpatrick as a "decent-sized" man in a black hoodie and black mask shooting an assault rifle from the street toward the house. [Tr. 226-27, 582.] As for Martinez's fiancée, Mary Hensley, she fled next door to the brother's home and was let in by Rolando Correa, Jr., a friend. [Tr. 205.] She heard at least 30 rounds of gun fire and dropped to the floor. [Tr. 206-07]. The rapid gunfire ended, and Correa told Hensley that he had been hit and asked for a pillow to stop the bleeding. [Tr. 207-208.]

Meanwhile, the get-away-driver (Landrum) heard gunshots and quickly drove to pick up his compatriots. [Tr. 581.] The friend who had fled the house (Horst) witnessed the get-away-driver and Hendry dragging a wounded Cherry into the vehicle while Fitzpatrick continued to fire the assault rifle in his direction. [Tr. 228-29]. The get-away-driver, Hendry, and Fitzpatrick then lifted Cherry into the vehicle and fled the scene. [Tr. 583-85.] After the robbers fled, an ambulance took Correa to the hospital where he

died of the gunshot wounds. [Tr. 149, 275, 613-14.]

The get-away-driver drove Hendry, Cherry, and Fitzpatrick to the gang member's home (Nieto) where the whole ill-fated plan began. But upon arrival, they were confronted by Nieto's neighbor who happened to be an off-duty police officer. The officer held them at gun point and was able to arrest the get-away-driver and Cherry while Hendry and Fitzpatrick got away. [Tr. 586-87]. Hendry called a fellow gang member to pick him and Fitzpatrick up. [Tr. 511.] Hendry and Fitzpatrick then changed and burned their clothes. [Tr. 518-21.] Fitzpatrick headed to his friend's home. [Tr. 429.] Upon arrival, another person Fitzpatrick knew, Efren Delangel, opened the door and described Fitzpatrick as spooked and nervous, trying to wash the blood off his hands with bleach. [Tr. 430.] Fitzpatrick told Delangel that, "I just laid a nigga down" and gestured as if shooting a rifle. [Tr. 430-32].

Following a four-day jury trial, a jury convicted Fitzpatrick of both the marijuana conspiracy and the use of a firearm during that conspiracy which resulted in the death of Rolando Correa, Jr. [DE 112.]

## Discussion

### A. Rule 29 Motion for Acquittal

Fitzpatrick may renew his motion for an acquittal after "the jury has returned a guilty verdict, [and] the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(1), (2). The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); Fed. R. Crim. Pro. 29(c). I will not "intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (citing *Jackson*, 443 U.S. at 319). Fitzpatrick faces a "nearly insurmountable hurdle" to show that the evidence could not support the guilty verdict. *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014).

Fitzpatrick argues that the government failed to prove beyond a reasonable doubt that he was part of a drug conspiracy. In reviewing the evidence, a reasonable jury could find that Fitzpatrick was part of a plot to steal and later distribute marijuana. Cherry explained to Fitzpatrick that the robbery involved stealing marijuana from a known drug dealer, consuming a portion of it, and selling the rest. Cherry intended to share his portion of the proceeds with Fitzpatrick. Fitzpatrick went with Cherry to the drug dealer's house and was given an assault rifle. After being involved in a shoot out and loading his friend who had been shot into the car, he showed up at a friend's house with blood on him. He was hyped up and exclaimed how he just shot someone. (Recall that he said, "I just put a nigga down.") This is sufficient evidence for a reasonable jury to find that Fitzpatrick was involved in the conspiracy to rob a drug dealer with intent to possess and later distribute marijuana, as charged in Count 1.

Fitzpatrick next claims the government failed to place him at the scene of the murder, charged in Count 2, and that testimony solely from a cooperating witness

shouldn't be believed. I have to view the evidence in the light most favorable to the verdict. Cherry personally testified to Fitzpatrick's involvement and placed him at the scene. Cherry knew Fitzpatrick since the age of 11 or 12 and the two were roommates. It was not unreasonable for the jury to weigh the credibility of Cherry's testimony and find his statements credible. Fitzpatrick believes that because independent eye witnesses on the scene never specifically identified him and no physical evidence linked him to the murder, that he should be acquitted. Unfortunately for Fitzpatrick, that is not the law. Fitzpatrick only cites authority from the Fifth and Ninth Circuits that circumstantial evidence is insufficient to support the jury's guilty verdict. However, the Seventh Circuit has stated multiple times that it may uphold a conviction based solely on circumstantial evidence. *United States v. Medina*, 969 F.3d 819, 821 (7th Cir. 2020); *United States v. Wasson*, 679 F.3d 938, 949 (7th Cir. 2012); *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009); *United States v. Studley*, 892 F.2d 518, 526 (7th Cir. 1989).

Evidence presented at trial could lead a reasonable jury to believe that Fitzpatrick agreed to steal and later distribute drugs, as charged in Count 1, and was present at the scene of the murder, as charged in Count 2. Jurors heard directly from Cherry, who specifically placed Fitzpatrick at the scene of the murder and detailed the conspiracy. They heard from Landrum, whose testimony identifying Fitzpatrick supported Cherry's story. They heard descriptions from Horst, Castillo, Delangel, and other witnesses as to Fitzpatrick's involvement and movements that day. A rational trier of fact considering the testimony and the corroborating evidence could have easily

found Fitzpatrick guilty beyond a reasonable doubt. Therefore, I deny Fitzpatrick's motion for acquittal.

### B. Rule 33 Motion for a New Trial

Fitzpatrick also seeks a new trial. The district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. *See United Green v. Junious,* 937 F.3d 109, 1013 (7th Cir. 2019) (providing that only if "no reasonable person would agree with the trial court's ruling and the error likely affected the outcome of the trial" will a new trial be granted). In contrast to a motion for acquittal, a district court is not required to view the evidence in the light most favorable to the government but must independently consider the evidence presented. *United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004), *vacated on other grounds*, 546 U.S. 12 (2005). Fitzpatrick's burden is still a heavy one—to show that the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice. *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011).

   1. *Co-conspirator Statements*

Fitzpatrick first argues that the court erred in admitting co-conspirator statements. A "statement" is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Admission of co-conspirator statements is proper when the government proves "by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the

conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy." *United States v. Santiago*, 582 F.2d 1128, 1134-35 (7th Cir. 1978). "[T]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or the participation in it . . . " Fed. R. Evid. 801(d)(2). Fitzpatrick claims that the co-conspirator statements fail to link him to the conspiracy. However, he fails to identify any specific co-conspirator statement to enable me to analyze whether the statement was improper. In reviewing the trial testimony, I find that voluminous evidence from trial more than satisfies beyond a reasonable doubt that Fitzpatrick was part of an agreement to engage in the robbery for drugs, where the drugs were to be either used or sold.

Cherry specifically identified Fitzpatrick in court and described his involvement in the robbery. The other co-conspirators similarly identified Fitzpatrick by his clothing, size, and height. Their testimony was supported by the personal knowledge of Martinez's friend (Horst), who identified a "decent-sized" man dressed in a black hoodie and black mask standing in the street shooting a rifle. Furthermore, Fitzpatrick's acquaintance (Delangel) testified to Fitzpatrick's appearance, demeanor, and self-incriminating statements. He stated that when Fitzpatrick showed up later that night, he observed blood on Fitzpatrick and Fitzpatrick attempting to wash the blood off his hands with bleach. He noted Fitzpatrick was acting spooked and nervous. When the acquaintance asked Fitzpatrick what was going on, Fitzpatrick said, "I just laid a nigga down" and gestured with his hands like he was shooting a rifle.

-8-

When considering the testimony given by various witnesses and corroborated by independent evidence, there is sufficient support to link Fitzpatrick to the conspiracy. Fitzpatrick had plenty of opportunity to attack the credibility of witnesses and evidence. However, the jury weighed the evidence and found him guilty on both counts. Fitzpatrick essentially wants me to replace the jury's credibility findings with my own and discredit witnesses the jurors found to be credible, and I decline to do so.

In sum, I find that the government established the existence of a conspiracy and Fitzpatrick's participation in it, and any co-conspirator statements were properly admitted under Rule 810(d)(2)(E).

2. *Voir Dire*

Fitzpatrick submitted 94 proposed voir dire questions for the potential jurors, some of which had multiple parts. [DE 60.] After asking the prospective jurors a battery of my own questions, I then asked many of the questions posed by the defense, but not all of them. Fitzpatrick now claims that *voir dire* questions were not thorough or individualized enough to discover jurors' prejudices. "[T]he Sixth Amendment does not demand any 'particular pattern of inquiry'" and trial judges have broad discretion in deciding the questions asked. *United States v. Hosseini*, 679 F.3d 544, 555 (7th Cir. 2012). I sifted through the 94 questions and numerous sub-questions and asked the ones that I thought were most germane to the question: whether the prospective jurors could be fair and impartial. The jurors were questioned for hours and both sides regularly followed up with their own questions. Fitzpatrick does not cite any part of the record

showing prejudice against him and fails to show that *voir dire* was improper and deprived him of a fair trial.

He further claims that the government improperly struck an African-American juror based on race and improperly referred to that potential juror as "defendant." First, the reference to the juror as the "defendant" was an obvious slip of the tongue by the prosecutor. Nothing more need be said about that. Second, in striking the potential juror the government noted that she had two relatives serving lengthy sentences for drug related offenses. [Tr. 12.] Peremptory challenges may not exclude potential jurors based on race, ethnicity, or sex. *Baston v. Kentucky*, 476 U.S. 79 (1986). When challenged, the government may present a race-neutral reason for a peremptory strike, so long as the reason is not inherently discriminatory. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). In this case, the government explained its concern about the sentencing disparity between the juror's relatives. The first relative pleaded guilty and received a twelve-year sentence. The second relative went to trial and received a twenty-five-year sentence. [Tr. 11.] This disparity in sentencing between a plea and verdict gave rise to legitimate concerns regarding this juror. I found this to be a race neutral reason to exclude the juror, and I remain of the same mind now. There was no *Baston* violation.

*3. Cross Examination*

Fitzpatrick next claims the court erred in preventing unlimited cross-examination of Cherry. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever

-10-

extent, the defense might wish." *Delaware* v. *Fensterer*, 474 U.S. 15, 20 (1985) *(per curiam)*. Throughout direct examination of Cherry, the government intentionally stayed away from asking Cherry any questions about conversations with Hendry. [Tr. 288, 291-2, 296, 302, 306, 316.] In doing so, the government did not "open the door" for the defense to cross-examine Cherry regarding any conversations with Hendry. Fitzpatrick argues that because later in the trial he was allowed to cross-examine Landrum about conversations with Hendry, his rights were violated in not being able to do the same with Cherry. However, the government's direct examination of Landrum distinctly opened the door to include Landrum's conversations with Hendry and was within the scope of cross-examination by the defense. [Tr. 579, 585-86.] Because the government did not open the door by asking Cherry about conversations with Hendry, any conversations between Cherry and Hendry were beyond the scope of cross-examination by the defense. Therefore, I find that any conversation between Cherry and Hendry fell outside the scope of cross-examination.

    4. *Rebuttal Evidence*

Fitzpatrick next argues that allowing a witness to testify regarding fingerprints from a third-party found in the get-away car was improper rebuttal testimony. "The proper function of rebuttal evidence is to 'contradict, impeach or defuse the impact of the evidence offered by an adverse party.'" *United States v. Grinties,* 237 F.3d 876, 879 (7th Cir. 2001) (citing *United States v. Papia*, 560 F.2d 827, 848 (7th Cir. 1977)).

Here's how the issue arose at trial. In its case in chief, the defense read a

-11-

stipulation that a fingerprint expert would testify that the fingerprints of Landrum and Cherry, along with a third person—a guy named Ron Anderson—were found inside the get-away car. In rebuttal, the government called the case agent to testify that he knew Anderson and that he was a white male, not a tall, lanky black man. This was offered by the government to rebut the inference that the defense was trying to draw through the stipulation that Anderson (and not Fitzpatrick) was the third person on the scene that night. [Tr. 680.] The defense was given an opportunity to cross-examine but declined. [*Id.*] The case agent's rebuttal testimony was entirely proper. It was offered to show that Anderson had a different stature than Fitzpatrick allowing the jury to conclude that Anderson's prints were left in the car at a different time. (Anderson and Landrum were roommates). Fitzpatrick fails to show how this rebuttal evidence deprived him of a fair trial.

   5. *Jury Instruction*

Fitzpatrick takes issue with certain jury instructions and the jury verdict form, describing them as misleading and inaccurate. In the final pretrial conference, I asked both parties to submit joint jury instructions and provide proposed jury instructions when they could not agree. [DE 71.] The Joint Instructions and the government's proposed instructions were timely filed. [DE 90, 91.] Fitzpatrick did not submit any proposed jury instructions. At the close of all the evidence at trial, I provided counsel with the Court's proposed jury instructions and a jury verdict form [DE 119, 120.] I held an instruction conference, and Fitzpatrick objected to Instruction Number 12. That

instruction comes from the Seventh Circuit Pattern Instruction Number 3.05, and it deals with witnesses who require special caution and care—i.e., cooperators who have been promised benefits by the government. There were four such witnesses in this case—Mark Cherry, James Landrum, John Castillo and Efren Delangel. Fitzpatrick's objection was that the Court should have given four separate instructions, one for each cooperator. That struck me as overly burdensome and cumbersome and chose instead to give one instruction which specifically told the jurors how they should treat the testimony of each of the cooperators. Instruction Number 12 was consistent with the Seventh Circuit Pattern Number 3.05, and the defense's objection to the contrary was properly overruled.

Fitzpatrick did not have any objection to Jury Instruction Number 34 at trial, [Tr. 692], but he does now in his motion for new trial. Therefore, any objection to Instruction 34 has been waived. *United States v. Perez*, 612 F.3d 879, 883 (7th Cir. 2010). But giving the instruction was correct in any event. For starters, the thrust of Fitzpatrick's objection to Instruction Number 34 is entirely unclear to me. Instruction Number 34 is a specific unanimity instruction. Fitzpatrick was charged in Count Two with using a firearm during and in relation to a drug conspiracy (Count One) and causing the death of another in the process. The elements of Count Two were given to the jury in Instruction Number 26. Count Two charged Fitzpatrick as both a principal and as an aider and abettor. Instruction Number 34 instructed the jury that it needed to unanimously agree on which theory of liability it was finding Fitzpatrick guilty of—as a principal or as an

-13-

aider and abettor. This instruction is consistent with the Seventh Circuit Pattern 4.04, and there was nothing improper about it.

Fitzpatrick also contests the jury verdict form, even though after lengthy discussion, an agreement had been reached on certain changes and I made the agreed changes. [Tr. 693-96.] Any objection coming at this point is therefore waived. *Gagan v. Am. Cablevision*, 77 F.3d 951, 966 (7th Cir. 1996). Fitzpatrick now argues that the jury verdict form contained improper and misleading information. He first summarily argues that including certain language "on the other hand" in the verdict form for Count One somehow misled the jury. I fail to see how. The "on the other hand" language was simply a rhetorical device to cue the jury that if they found the defendant not guilty of Count 1, they should then also find him not guilty of Count Two because guilt on Count One is one of the elements of Count Two. I fail to see the error in using the "on the other hand" language. Fitzpatrick further contends that had the jury not found him guilty on Count 1, the instruction should have required his acquittal of Count 2, using "must" rather than "should." This argument is a trifle. First, Fitzpatrick *was* convicted on Count One, so it's hard to see any harm done. And anyway, the word "should" is the past tense of "shall." It's a verb that is used "to express obligation or duty." The American Heritage Dictionary (Second College ed., 1982). And in all events, counsel never objected to the use of the term "should" instead of "must" so the issue is waived.

*6. Remaining Arguments*

Finally, Fitzpatrick claims multiple errors including overruling various objections, allowing the government to make certain statements in opening and closing arguments, sustaining objections during Fitzpatrick's closing arguments, and denying the motions for acquittal and mistrial. Fitzpatrick's brief is filled with numerous small sections that state a conclusory argument, cite verbatim a section of the record, and then proceed to the next alleged error. He fails to provide any legal analysis supporting his claims. An argument that is neither developed nor supported does not warrant consideration. *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 562 n.3 (7th Cir. 2004) (describing a "laundry list" of "unorganized factual allegations [] prefaced or followed by conclusory statements. Plaintiff's counsel should be well aware that courts are not to do counsel's work of organizing its arguments nor are they 'in the business of formulating arguments for the parties.'" (citing *United States v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999)). Nevertheless, I will address the undeveloped objections where I did not immediately follow up with a reason during trial.

Fitzpatrick first claims error in overruling a speculation objection asking witness Brian Lee Horst "[w]hen you turned the corner, could he see you right then, or did it take awhile?" [Tr. 227.] Witnesses are entitled to provide lay opinions rationally based on their perspective. *See* Fed.R. Evid. 701. Because the question could be viewed as seeking a lay opinion, I stand by the ruling.

Leading questions are permissible if "used with friendly witnesses to move

-15-

direct examination along rather than elicit testimony damaging to the opposing party that the witness might not have given in response to a neutral question." *United States v. Miller*, 782 F.3d 793, 799 (7th Cir. 2015). Fitzpatrick claims that the following questions were leading: "Do you know if Tony sold marijuana to anyone that day?" [Tr. 255]; "Okay. Now, when you say you don't remember, I'm asking is it because you don't remember just because a lot of things happened since then, or you don't remember because you had been shot?" [Tr. 325]; and "What happened once you got to Lake Station? Did anyone get in or out of the car?" [Tr. 525.] None of these questions suggest the answer so they were not leading. But even if they were, the government was merely directing these questions to move the direct examination along. Therefore, I do not find an error with any of these questions.

Hearsay is an out of court statement used to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Fitzpatrick claims the court improperly overruled his hearsay objections for the following statements. "Did Bruce Hendry get in the front seat or back seat?" [Tr. 508.] This is not a statement, but a personal observation. "Without getting into anything that Mr. Hendry said, where did you go?" [Tr. 510.] This is also not a statement at all; it asks where the witness went. "Do you trust Bruce to do a robbery with?" [Tr. 301.] This is also not a statement; it seeks information regarding Cherry's personal relationship with Hendry. Fitzpatrick also claims this question is irrelevant, but that is hardly the case. Relevance is any tendency to make a fact more or less probable and of determining consequence. Fed. R. Evid. 401. Clearly, whether

Cherry trusts Hendry in a conspiracy for robbery is undoubtably relevant here. Fitzpatrick also finds the following questions lack relevancy, but I disagree. "How do you think alcohol and the slight drug use has affected your memory?" [Tr. 500.] When asking a witness this type of question, it is relevant to know the witness's state of mind and whether it was affected around the time of the events. "How long was your total involvement in this episode?" [Tr. 588.] When the government asked Landrum this question, it is absolutely relevant how long Landrum was involved in the robbery at the time of the event.

For every other objection raised, I have reviewed the record and continue to agree with the rulings that were made.

Finally, Fitzpatrick objects to the prosecutor's closing argument. In particular, he argues that the government misstated the evidence and attempted to shift the burden. When defense counsel objected to facts as stated by the prosecutor, I instructed the jury to rely on its collective memory of the evidence and if counsel described something different than their collective memories, it is *their* memory of the evidence, not the prosecutor's, that should guide. [Tr. 707-08.] As for the issue of whether the prosecutor was shifting the burden, the prosecutor told the jury that the defendant had subpoena power just as the government does. This is not burden shifting. *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016). In any event, during trial, I specifically instructed the jury immediately after the prosecutor's statement that the burden remains with the government at all times and that the defendant doesn't have to prove anything. [Tr.

-17-

734-35.] There was no error.

## Conclusion

Fitzpatrick has failed to meet the heavy burden of showing that the verdict is so contrary to the weight of the evidence that justice requires a new trial, and I deny his motion for a new trial.

ACCORDINGLY:

Defendant Lajuan Fitzpatrick's motions for a judgment of acquittal and new trial [DE 134, 135] are DENIED.

SO ORDERED on October 30, 2020.

/ s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT